[No. B224598. Second Dist., Div. Three. Nov. 6, 2012.]

ALAN W. FAIGIN, Plaintiff and Appellant, v.
SIGNATURE GROUP HOLDINGS, INC., Defendant and Appellant.

**COUNSEL**

Woolls & Peer, H. Douglas Galt, Sean B. Dean; Kellman Hoffer and Daniel P. Hoffer for Plaintiff and Appellant.

Horvitz & Levy, Bradley S. Pauley, James A. Sonne; Bate, Peterson, Deacon, Zinn & Young, Linda Van Winkle Deacon, Stephanie M. Saito and Barri Lyn Friedland for Defendant and Appellant.

**OPINION**

**CROSKEY, Acting P. J.**—Signature Group Holdings, Inc., formerly known as Fremont Reorganizing Corporation (FRC), appeals a judgment awarding Alan W. Faigin $1,347,000 in damages for breach of an implied-in-fact agreement to terminate his employment only for good cause.[1] FRC contends the evidence does not support the jury verdict and some of the jury's factual findings are contrary to law. FRC also contends the damages are excessive and challenges the admission of evidence and the refusal of its proposed jury instructions.

[1] FRC was formerly known as Fremont Investment & Loan. We will use the term FRC to refer to the same company whether it was known at the time as Fremont Investment & Loan or Fremont Reorganizing Corporation, or as Signature Group Holdings, Inc., its current name.

Faigin appeals a postjudgment order denying his motion for prejudgment interest. He contends he is entitled to an award of prejudgment interest on his unliquidated claim for damages under Civil Code section 3287, subdivision (b).

We conclude that substantial evidence supports the jury verdict and that FRC has shown no legal error or prejudicial abuse of discretion. We also conclude that the denial of Faigin's motion for prejudgment interest was proper. We therefore will affirm the judgment and the postjudgment orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Factual Background

Faigin started working for Fremont General Corporation (Fremont General) in August 1980 while he was still attending law school. He became assistant general counsel for both Fremont General and its subsidiary Fremont Indemnity Company (Fremont Indemnity) upon passing the bar exam in 1983. He performed legal work for other subsidiaries of Fremont General as well, including FRC (then known as Fremont Investment & Loan) starting in 1990. The W-2 forms that he received identified Fremont General as his employer rather than FRC or another subsidiary.

Faigin began working for FRC as an associate general counsel. He became general counsel and secretary for all Fremont companies, including FRC, in 1996. He also became chief legal officer for FRC in 2004. The Federal Deposit Insurance Corporation (FDIC) issued a cease and desist order in March 2007 requiring FRC to replace its senior management and take other measures to improve its lending practices.

Faigin and Fremont General entered into a written employment contract dated April 11, 2007, stating that Faigin would be employed as senior vice-president, general counsel and chief legal officer of Fremont General and would continue to have the same responsibilities and compensation as were in effect on the date of the agreement. It stated that Fremont General would pay Faigin an annual salary of $425,000 and that he would be eligible for an annual bonus and other executive benefits. It stated that the board of directors of Fremont General could change his responsibilities and compensation from time to time, but that he would be entitled to certain benefits if such a change constituted an "Involuntary Termination" as defined in the contract. It stated that Faigin would "devote his full business efforts and time to the Company [(Fremont General)] and its subsidiaries." The agreed term of employment was three years.

The written employment contract defined an "Involuntary Termination" as including, among other things, a termination without cause or a significant change in his job duties. It stated that Faigin was entitled to a lump-sum payment equal to three years of his base salary in the event of such an occurrence. It stated that Faigin had no duty to mitigate the amount of any such payment and that such payment would not be reduced by the amount of any earnings from another source.

Faigin was appointed interim president and chief executive officer of FRC in June 2007. When the FRC board of directors considered hiring a new management group, Faigin informed the directors and major shareholders of his objections to the proposal.

The new management group began working at FRC in November 2007. Faigin sent a letter to Fremont General dated November 27, 2007, stating that an "Involuntary Termination" had occurred as a result of significant changes in his job duties. He stated that he therefore was entitled to a lump-sum payment equal to three years of his base salary and other benefits due under the written employment contract. The new management group was formally appointed to FRC in December 2007, including a president, a chief executive officer and a general counsel replacing Faigin in those positions. Donald E. Royer replaced Faigin as general counsel of FRC. Faigin also lost his title as chief legal officer at that time. Faigin was formally relieved of his positions by vote of the FRC board of directors on December 20, 2007. He had been employed by FRC continuously for over 17 years.

Faigin's annual salary on the date of the termination of his employment with FRC was $425,000. He continued to perform legal work for other Fremont entities after December 2007 and received a $24,000 salary increase in January 2008 to compensate him for the loss of his automobile allowance.

Faigin initiated an arbitration proceeding against Fremont General in February 2008. He continued to receive his salary until March 12, 2008. On that date, he received a letter from Fremont General stating that his employment with Fremont General was being terminated for cause effective immediately. The letter stated four reasons for the termination of his employment. Fremont General filed a chapter 11 bankruptcy petition in June 2008. FRC ceased doing business as a bank in July 2008.

2.   *Pretrial Proceedings*

Faigin filed a complaint against FRC on January 15, 2009, and filed a first amended complaint on January 23, 2009. He alleged that he was jointly employed by Fremont General and FRC pursuant to a written employment

contract dated April 11, 2007. He alleged that the contract provided for certain payments in the event of an "Involuntary Termination" and that a significant change in his job duties constituting an "Involuntary Termination" had occurred in late 2007 when he was replaced as general counsel. He also alleged that his employment was wrongfully terminated in March 2008 in retaliation for his requests for payments allegedly due him because of the significant change in his job duties. Faigin alleged counts against FRC for breach of the written employment contract, breach of the implied covenant of good faith and fair dealing, wrongful termination in violation of public policy and Labor Code violations, among other counts.

FRC filed a cross-complaint against Faigin in April 2009 alleging that Faigin violated his fiduciary duties owed to FRC by informing the Insurance Commissioner acting as liquidator of Fremont Indemnity that Fremont General and FRC were in the process of auctioning certain artworks that purportedly were owned by Fremont Indemnity. FRC alleged that the commissioner commenced an adversary proceeding against Fremont General and FRC in May 2008 as a result of Faigin's statements made to the commissioner.

The trial court granted Faigin's special motion to strike FRC's entire cross-complaint in June 2009. On appeal, we reversed the order as to the striking of some counts and affirmed it as to the striking of others. (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1178 [131 Cal.Rptr.3d 478].)

FRC filed a motion in limine in December 2009 to exclude from trial any evidence or argument of any conduct, behavior or activity of Fremont General. FRC argued that FRC was not a party to the written employment contract between Faigin and Fremont General and that the written employment contract therefore could not be presented as evidence that FRC was Faigin's employer. FRC argued that any employment relationship between Faigin and FRC must be based on FRC's conduct rather than Fremont General's conduct. FRC argued that the written employment contract was irrelevant, unduly prejudicial and that its introduction in evidence would violate the bankruptcy stay.

Faigin served an offer to compromise (Code Civ. Proc., § 998) in January 2010, offering to accept $1,274,999, which was $1 less than three times his 2007 annual salary, in exchange for the dismissal of his complaint. FRC did not accept the offer. The trial court granted FRC's motion in limine in February 2010, and the case proceeded to a jury trial.

### 3. *Trial, Verdict and Judgment*

After the close of Faigin's case-in-chief, FRC orally moved for a nonsuit against all remaining counts. Faigin opposed the motion and requested leave to amend his complaint to conform to proof at trial to allege a count for breach of an implied-in-fact employment contract with FRC. The trial court granted the motion for nonsuit against several counts, but denied the motion to the extent that Faigin could allege a count for breach of an implied-in-fact employment contract and granted Faigin leave to amend the complaint to allege such a count. The court also ruled at that time that Faigin could reopen his case to present additional evidence of an implied-in-fact employment contract, which he did.

The trial court instructed the jury on a single count for breach of an implied-in-fact employment contract between Faigin and FRC, including an implied-in-fact agreement to terminate his employment only for good cause. The court instructed that "cause" exists when the employer's decision is made in good faith and is based on a fair and honest reason that is neither trivial, arbitrary, inconsistent with usual practices nor unrelated to business needs or goals.

The jury returned a special verdict finding that (1) Faigin was an employee of FRC, (2) he and FRC were parties to an employment contract, (3) FRC breached the employment contract and (4) Faigin was entitled to $1,347,000 in damages for breach of contract.[2] The court entered a judgment on the jury verdict on February 24, 2010.

### 4. *Posttrial Proceedings*

Faigin filed a posttrial motion for an award of prejudgment interest under Civil Code section 3287, subdivision (b). He argued that although he initially sought liquidated damages pursuant to the written employment agreement, he later sought and was awarded an unliquidated amount equal to three times his final annual salary pursuant to an implied-in-fact employment contract. He argued that FRC was aware of the amount he sought all along and would receive a windfall if he were not awarded prejudgment interest. Faigin sought prejudgment interest from the date of his initial arbitration demand. FRC opposed the motion. The trial court denied the motion.

---

[2] The jury answered "yes" to the questions (1) "Do you find that plaintiff, Alan W. Faigin was an employee of defendant Fremont Reorganizing Corporation (FRC), formerly known as Fremont Investment and Loan?"; (2) "Do you find that plaintiff had an employment contract with defendant?"; and (3) "Do you find that defendant breached the contract?" The jury answered "$1,347,000" to the question "What amount of damages do you award plaintiff for the breach of contract."

FRC moved for a new trial and for judgment notwithstanding the verdict asserting many of the same arguments that it asserts on appeal, among others. The trial court denied both motions.

FRC timely appealed the judgment and the denial of its motion for judgment notwithstanding the verdict.[3] Faigin timely appealed the denial of his motion for an award of prejudgment interest.

## CONTENTIONS

FRC contends leave to amend Faigin's complaint should have been denied and FRC is entitled to judgment in its favor because (1) there is no substantial evidence that Faigin was an employee of FRC or that FRC terminated his employment; (2) no implied-in-fact agreement to terminate only for good cause could arise as a matter of law; (3) there was no consideration for such an implied agreement; (4) any employment termination was for good cause as a matter of law; and (5) any implied-in-fact employment contract would have violated the cease and desist order and be void and therefore could not arise.

FRC also contends (6) the damages award constitutes an illegal golden parachute payment; (7) there is no substantial evidence that Faigin suffered any loss of income and therefore no evidence to support damages in any amount; (8) the trial court erred by admitting evidence of Royer's written employment contract with FRC; (9) the court erred by allowing Faigin to testify regarding a statement made to him by the outgoing chairman of FRC's board of directors and regarding his predecessor's length of employment; (10) the refusal of FRC's proposed instructions on required third party approval to form a contract was error; and (11) the damages award is excessive.

Faigin contends the denial of his motion for prejudgment interest under Civil Code section 3287, subdivision (b) was error.

---

[3] The judgment was a final, appealable judgment because it terminated the litigation between the parties and left nothing for future consideration by the trial court apart from enforcement of the judgment. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 698–699 [107 Cal.Rptr.2d 149, 23 P.3d 43].) Although we later reversed in part the dismissal of FRC's cross-complaint against Faigin, we believe that the finality of a judgment for purposes of appeal should be determined as of the date that a notice of appeal was filed (see *Bode v. Clark Equipment Co.* (10th Cir. 1986) 807 F.2d 879, 881), except where the judgment is subsequently modified or vacated such as on a new trial motion (*Neff v. Ernst* (1957) 48 Cal.2d 628, 634 [311 P.2d 849]).

## DISCUSSION

1. *The Evidence Supports the Findings That Faigin Was an FRC Employee and That FRC Terminated His Employment*

   a. *Standard of Review*

FRC challenges the trial court's ruling allowing Faigin to amend his complaint to conform to proof at trial and the jury's findings that Faigin was an employee of FRC and that FRC terminated his employment.

■ A trial court may allow the amendment of a pleading at any time up to and including trial. (Code Civ. Proc., §§ 576, 473, subd. (a)(1).) Leave to amend to conform to proof at trial ordinarily should be liberally granted unless the opposing party would be prejudiced by the amendment. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31 [69 Cal.Rptr. 568, 442 P.2d 648].) Leave to amend a complaint at trial is properly denied, however, if the proposed amendment raises new issues that the defendant has had no opportunity to defend (*ibid.*) or the material facts are undisputed and the proposed amendment would not establish a basis for liability as a matter of law (*Edwards v. Superior Court* (2001) 93 Cal.App.4th 172, 180 [112 Cal.Rptr.2d 838]). FRC does not contend it was prejudiced by the amendment or that the amendment raised new issues that it had no opportunity to defend. Instead, FRC argues that the amendment was improper because there was no substantial evidence to support liability for breach of an implied-in-fact employment contract.

We review findings by the trier of fact under the substantial evidence standard, and FRC's challenge to the granting of leave to amend the complaint based on insufficiency of the evidence also amounts to a substantial evidence challenge. Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible and of solid value. We view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence. We affirm the judgment if an examination of the entire record viewed in this light discloses substantial evidence to support the judgment. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Mealy v. B-Mobile, Inc.* (2011) 195 Cal.App.4th 1218, 1223 [124 Cal.Rptr.3d 804].)

   b. *Substantial Evidence Supports the Finding That Faigin Was an FRC Employee*

Faigin testified that he worked for FRC continuously from 1990 until December 2007, initially as associate general counsel and later as general

counsel, secretary and chief legal officer. He testified that he also served as FRC's interim president and chief executive officer for a period of time. He described some of the work he performed for FRC, including efforts to comply with FDIC requirements, and testified that he supervised other attorneys at FRC. He testified that he occupied an office at FRC. Faigin testified that he also worked for Fremont General and for other Fremont subsidiaries during the same period of time, but no evidence of his written employment contract with Fremont General was presented at trial and there was no evidence that Fremont General or any other Fremont entity was his sole employer.

The trial court instructed the jury on the essential elements of an implied-in-fact employment contract, but did not instruct the jury on the requirements to establish an employment relationship. We review the sufficiency of the evidence to support the verdict under the law stated in the instructions given, rather than under some other law on which the jury was not instructed. (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 674–675 [71 Cal.Rptr.3d 775]; *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1534–1535 [254 Cal.Rptr. 492].) FRC does not assert instructional error with respect to the absence of instructions on the existence of an employment relationship. Absent an instruction on the requirements to establish an employment relationship, the jury presumably decided the question whether Faigin was an "employee" of FRC based on its understanding of the ordinary meaning of the term. In our view, the evidence that Faigin worked for FRC for 17 years, held various high-level positions in the company and maintained an office at FRC is sufficient to support the finding that he was an FRC "employee" as that term is commonly understood.[4]

Contrary to FRC's argument, neither the evidence that Faigin worked for other Fremont entities while his salary remained unchanged, nor the evidence that his W-2's from Fremont General did not identify FRC as his employer, nor the evidence that he never formally applied for employment with FRC, compels the conclusion as a matter of law that he was not an FRC employee.

FRC also argues that the finding that Faigin was an FRC employee is contrary to his binding judicial admission that his employment relationship was governed exclusively by his written employment contract with Fremont General. Faigin admitted the existence of the written contract by alleging it in his complaint. (*Valerio v. Andrew Youngquist Construction* (2002) 103

---

[4] A person rendering service for another, other than as an independent contractor, is presumed to be an employee. (Lab. Code, § 3357.) The alleged employer has the burden of proof to overcome this presumption. (Evid. Code, § 606; *Superior Care Facilities v. Workers' Comp. Appeals Bd.* (1994) 27 Cal.App.4th 1015, 1023 [32 Cal.Rptr.2d 918].) Although the jury was not so instructed, its finding is consistent with this rule of law.

Cal.App.4th 1264, 1271 [127 Cal.Rptr.2d 436].) Faigin neither alleged nor admitted, however, that the written contract exclusively governed his employment for the Fremont entities. He therefore is not bound by any judicial admission in this regard.

> c. *Substantial Evidence Supports the Finding That FRC Terminated Faigin's Employment*

FRC contends there is no evidence that FRC terminated Faigin's employment in December 2007, or at any time, and the evidence that Faigin continued to work for other Fremont entities and received his salary and benefits after that date indicates that his employment continued until Fremont General terminated it in March 2008. We disagree.

The evidence shows that Faigin worked for FRC for 17 years, held high-level positions in the company, and maintained an office at FRC until FRC's board of directors asked him to resign his positions in December 2007. The evidence shows that at or about that time, Faigin was replaced in his positions, stopped working for FRC and was required to vacate his office. We conclude that this evidence supports the finding that FRC terminated his employment in December 2007. The fact that Faigin continued to work for other Fremont entities and received essentially the same compensation until his employment for all Fremont entities was terminated in March 2008 is not necessarily inconsistent with the termination of his employment for FRC in December 2007 and does not compel the conclusion as a matter of law that FRC did not terminate Faigin's employment in December 2007.

> 2. *FRC's Other Arguments Against the Existence of an Implied-in-fact Employment Contract Are Unavailing*

>> a. *The Written Employment Contract with Fremont General Does Not Preclude the Existence of an Implied-in-fact Contract with FRC*

FRC contends no implied-in-fact employment contract could arise between FRC and Faigin as a matter of law because Faigin's written employment contract with Fremont General exclusively governed his employment. FRC argues that because Faigin was obligated to perform legal services for Fremont General and its subsidiaries under the terms of his written contract with Fremont General, no implied contract with FRC imposing additional or different obligations could arise.

Although FRC refers generally to an implied-in-fact employment contract, the particular agreement at issue is an implied-in-fact agreement to

terminate only for good cause. The existence and content of such an agreement are determined from the totality of the circumstances, including the employer's personnel policies and practices, the employee's length of service, actions and communications by the employer reflecting assurances of continued employment, and practices in the relevant industry. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 336–337 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).) The question whether such an implied-in-fact agreement exists is a factual question for the trier of fact unless the undisputed facts can support only one reasonable conclusion. (*Ibid.*)

■ An implied-in-fact agreement to terminate only for good cause cannot arise if there is an express writing to the contrary, such as a written acknowledgement that employment is at will or an at-will provision in a written employment agreement. (*Agosta v. Astor* (2004) 120 Cal.App.4th 596, 604 [15 Cal.Rptr.3d 565]; *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1387 [88 Cal.Rptr.2d 802]; *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 630 [41 Cal.Rptr.2d 329]; see *Guz, supra,* 24 Cal.4th at p. 340, fn. 10.) "There cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results. [Citations.]" (*Shapiro v. Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613], disapproved on another point in *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 700, fn. 42 [254 Cal.Rptr. 211, 765 P.2d 373].)

A subsidiary employing an individual who has a written employment contract with the parent conceivably could agree to continue to employ the individual unless there is good cause to terminate the employment even if the parent, for whatever reason, terminates the individual's employment with the parent. The jury did not consider whether that occurred here because FRC successfully moved to exclude any evidence of Faigin's employment contract with Fremont General. Instead, the jury found based on the evidence admitted at trial that Faigin was an FRC employee and that FRC breached an implied-in-fact agreement to terminate only for good cause.

Faigin's written employment contract with Fremont General stated a fixed employment term of three years and did not state that his employment during that period of time with all Fremont entities, or with Fremont General, was at will.[5] We conclude that the written contract is not inconsistent with an implied-in-fact agreement that FRC would terminate his employment only for good cause and therefore does not preclude the existence of such an implied agreement.

---

[5] The presumption that employment is at will arises only if the term of employment is unspecified. (Lab. Code, § 2922.)

b. *FRC Failed to Establish as a Matter of Law a Lack of Consideration for an Implied Agreement to Terminate Only for Good Cause*

FRC contends no implied-in-fact agreement to terminate only for good cause could arise because Faigin was already obligated under the terms of his written contract with Fremont General to work for all Fremont subsidiaries and therefore provided no consideration for such an implied agreement.

. ▪ An implied-in-fact agreement to terminate only for good cause is regarded as an offer of a unilateral contract. ▪ A unilateral contract is one in which there is only one promisor. Any act or forbearance by the promisee may constitute consideration for the promise and an acceptance of the offer. (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 10 [96 Cal.Rptr.2d 179, 999 P.2d 71].) An employee's continuing to work for his or her employer can constitute consideration for the employer's promise to terminate only for good cause. (*Ibid.*) Performing an act that the person is legally obligated to perform, however, cannot constitute consideration for a contract. (*Pacific Finance Corp. v. First Nat. Bk.* (1935) 4 Cal.2d 47, 50 [47 P.2d 460]; see *Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172, 1185 [88 Cal.Rptr.2d 718].)

There was no evidence admitted at trial that Faigin was legally obligated to work for FRC. Faigin's written employment contract with Fremont General in which he agreed to work for Fremont General and its subsidiaries for a three-year period was excluded at trial on FRC's own motion in limine. In any event, the written contract provided that Faigin could terminate his employment at any time by giving written notice. Faigin therefore had no contractual obligation to continue to work for FRC, and his continuing to work for FRC constituted consideration for FRC's implied promise to terminate only for good cause.

Moreover, FRC did not argue at any time before the jury returned its verdict that, as a matter of law, there was no consideration for an implied-in-fact agreement to terminate only for good cause. Instead, FRC submitted the question of the existence of such an agreement to the jury to decide as a question of fact. We conclude that having failed to timely raise the issue of lack of consideration in the trial court and having instead voluntarily submitted the question of the existence of an implied-in-fact agreement for the jury to decide as a question of fact, FRC cannot now argue on appeal that the existence of such an agreement should have been decided by the court as a question of law. (*Tesoro del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 630 [133 Cal.Rptr.3d 167]; *County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1118 [5 Cal.Rptr.3d 575].)

Accordingly, we conclude that FRC has shown no error on these grounds.

> c. *FRC Failed to Establish as a Matter of Law That the Cease and Desist Order Precluded the Existence of an Implied Contract with FRC or That It Established the Existence of Good Cause*

FRC contends any implied-in-fact employment contract without the prior written approval of the FDIC and California's Department of Financial Institutions would have violated the cease and desist order and therefore would be void and could not arise as a matter of law. FRC also contends the purported termination of Faigin's employment was a direct result of his replacement by a management group approved by the FDIC and therefore was for good cause as a matter of law.

The cease and desist order included the following provision: "During the life of this ORDER, the Bank (FRC) shall notify the Regional Director [of the FDIC] and the Commissioner [of the Department of Financial Institutions] in writing when it proposes to add any individual to the Bank's board of directors or employ any individual as a senior executive officer. The notification must be received at least 30 days before such addition or employment is intended to become effective and should include a description of the background and experience of the individual or individuals to be added or employed. The Bank shall not employ a senior executive who is associated in any manner with an affiliate as defined in 12 U.S.C. § 371c without the Regional Director's and the Commissioner's prior written approval."

Whether this provision prohibited FRC from employing Faigin without the prior written approval of the regulatory agencies depends on whether the prior approval requirement applied to both existing and new employees or only to new employees. On this record, we interpret the provision to mean that the prior approval requirement applied only to new employees in senior executive positions. The reference to "30 days before such addition or employment is intended to become effective," in particular, suggests that the requirement applied only to new employees. We reject FRC's argument that the requirement applied to new employment contracts with existing employees.

Moreover, we also reject FRC's argument that any implied-in-fact employment contract must have arisen after the issuance of the cease and desist order on March 7, 2007, and therefore was governed by the cease and desist order. FRC argues that this is so because the assurance of job security that Faigin cited in support of an implied-in-fact agreement to terminate only for good cause was communicated to him after that date. We need not discuss the

merits of this argument except to state that it confuses the general implied-in-fact contract of employment, which might have come into existence before the date of the cease and desist order, with the specific implied-in-fact agreement to terminate only for good cause. We conclude that FRC has not shown as a matter of law that the implied-in-fact employment contract arose after the date of the cease and desist order.

FRC argues that Faigin's departure from FRC was a necessary result of the cease and desist order, which required FRC to have and retain only qualified management personnel. FRC cites evidence that the new management team was approved by the FDIC, but cites no evidence that FRC reasonably believed that Faigin was unqualified. Absent evidence compelling the conclusion that FRC reasonably believed that Faigin was unqualified, FRC has not shown that it terminated his employment for good cause as a matter of law.

### 3.  *FRC Has Shown No Error in the Award of Damages*

#### a.  *FRC Failed to Establish as a Matter of Law That the Damages Award Constitutes an Illegal Golden Parachute Payment*

FRC contends any severance payment pursuant to an implied-in-fact employment contract would constitute an illegal golden parachute payment in violation of federal law.

The Federal Deposit Insurance Act (12 U.S.C. § 1811 et seq.) states that the FDIC may prohibit or limit any "golden parachute payment." (12 U.S.C. § 1828(k)(1).) The act defines the term "golden parachute payment" as:

"any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party pursuant to an obligation of such institution or covered company that—

"(i) is contingent on the termination of such party's affiliation with the institution or covered company; and

"(ii) is received on or after the date on which—

"(I) the insured depository institution or covered company, or any insured depository institution subsidiary of such covered company, is insolvent;

"(II) any conservator or receiver is appointed for such institution;

"(III) the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition (as defined in the regulations prescribed pursuant to section 1831i(f) of this title);

"(IV) the insured depository institution has been assigned a composite rating by the appropriate Federal banking agency or the Corporation [(FDIC)] of 4 or 5 under the Uniform Financial Institutions Rating System; or

"(V) the insured depository institution is subject to a proceeding initiated by the Corporation to terminate or suspend deposit insurance for such institution." (12 U.S.C. § 1828(k)(4)(A).)

An FDIC regulation (12 C.F.R. § 359.1(f)(1) (2012)) defines the term "golden parachute payment" as:

"any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or an affiliated depository institution holding company for the benefit of any current or former IAP [(institution-affiliated party)] pursuant to an obligation of such institution or holding company that:

"(i) Is contingent on, or by its terms is payable on or after, the termination of such party's primary employment or affiliation with the institution or holding company; and

"(ii) Is received on or after, or is made in contemplation of, any of the following events:

"(A) The insolvency (or similar event) of the insured depository institution which is making the payment or bankruptcy or insolvency (or similar event) of the depository institution holding company which is making the payment; or

"(B) The appointment of any conservator or receiver for such insured depository institution; or

"(C) A determination by the insured depository institution's or depository institution holding company's appropriate federal banking agency, respectively, that the insured depository institution or depository institution holding company is in a troubled condition, as defined in the applicable regulations of the appropriate federal banking agency (§ 303.101(c) of this chapter); or

"(D) The insured depository institution is assigned a composite rating of 4 or 5 by the appropriate federal banking agency or informed in writing by the

Corporation that it is rated a 4 or 5 under the Uniform Financial Institutions Rating System of the Federal Financial Institutions Examination Council, or the depository institution holding company is assigned a composite rating of 4 or 5 or unsatisfactory by its appropriate federal banking agency; or

"(E) The insured depository institution is subject to a proceeding to terminate or suspend deposit insurance for such institution; and

"(iii)(A) Is payable to an IAP whose employment by or affiliation with an insured depository institution is terminated at a time when the insured depository institution by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (f)(1)(ii)(A) through (E) of this section, or in contemplation of any of these conditions; or

"(B) Is payable to an IAP whose employment by or affiliation with an insured depository institution holding company is terminated at a time when the insured depository institution holding company by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (f)(1)(ii)(A), (C) or (D) of this section, or in contemplation of any of these conditions." (Italics omitted.)

Another FDIC regulation (12 C.F.R. § 359.0(b) (2012)) explains: "The limitations on golden parachute payments apply to troubled insured depository institutions which seek to enter into contracts to pay or to make golden parachute payments to their IAPs. The limitations also apply to depository institution holding companies which are troubled and seek to enter into contracts to pay or to make golden parachute payments to their IAPs as well as healthy holding companies which seek to enter into contracts to pay or to make golden parachute payments to IAPs of a troubled insured depository institution subsidiary. A 'golden parachute payment' is generally considered to be any payment to an IAP which is contingent on the termination of that person's employment and is received when the insured depository institution making the payment is troubled or, if the payment is being made by an affiliated holding company, either the holding company itself or the insured depository institution employing the IAP, is troubled. The definition of golden parachute payment does not include payments pursuant to qualified retirement plans, nonqualified bona fide deferred compensation plans, nondiscriminatory severance pay plans, other types of common benefit plans, state statutes and death benefits. Certain limited exceptions to the golden parachute payment prohibition are provided for in cases involving the hiring of a white knight and unassisted changes in control. A procedure is also set forth whereby an institution or IAP can request permission to make what would otherwise be a prohibited golden parachute payment." (Italics omitted.)

■ Thus, a payment or an agreement to make a payment constitutes a golden parachute payment only if, among other requirements, the payment is (1) made by an "insured depository institution" or "an affiliated depository institution holding company" (12 C.F.R. § 359.1(f)(1) (2012)); (2) contingent on, or payable on or after, the termination of the party's employment or affiliation with the institution or holding company; and (3) received on or after the date that, as relevant here, the institution or holding company is determined to be in troubled condition, or is made in contemplation of such an event (*id.*, § 359.1(f)(1)(ii)(C) (2012)).  ■  A " 'depository institution holding company' " is defined as any company that has control over a bank or a savings association or has control over a bank holding company or a savings and loan holding company. (12 U.S.C. § 1813(w); see *id.*, §§ 1841(a)(1), 1467a.)

■ The FDIC's regulations state that an insured depository institution may make or agree to make a golden parachute payment only if the appropriate federal banking agency determines that the payment or agreement is permissible and the FDIC consents in writing, or, in certain circumstances, the payment is made pursuant to an agreement providing for severance pay not exceeding 12 months' salary and the insured depository institution obtains the approval of the appropriate federal banking agency prior to making the payment. (12 C.F.R. § 359.4(a)(1)–(3) (2012).)

We conclude that the damages award here does not constitute a golden parachute payment. First, the damages award is based on FRC's breach of an implied-in-fact agreement to terminate only for good cause. The award is not based on the breach of a severance agreement, and the jury did not find that any severance agreement existed. The damages award therefore does not constitute or reflect an agreement to make a payment in the nature of compensation contingent on the termination of Faigin's employment or affiliation with FRC.

Second, as of the date of the judgment FRC had ceased its banking business and was no longer an insured depository institution subject to regulation by the FDIC. FRC's payment of the damages award therefore will not constitute a payment by either an insured depository institution or a depository institution holding company. Absent either a payment constituting a golden parachute by an institution subject to regulation by the FDIC or an agreement to make such a payment, FRC has shown no error on these grounds.[6]

---

[6] FRC cites a discussion published by the FDIC upon its adoption of the final rule limiting golden parachute payments stating that if the payment was prohibited at the time of termination because the institution was in a troubled condition, the payment is prohibited forever (61 Fed.Reg. 5926 (Feb. 15, 1996)). We construe this to mean that the rule was

### b. *The Evidence Supports the Damages Award*

FRC contends there is no substantial evidence that Faigin suffered any loss of income and therefore no evidence to support an award of damages in any amount. FRC cites evidence that Faigin's annual salary increased by $24,000 beginning in January 2008 to compensate him for the loss of his automobile allowance; he continued to receive his salary until March 12, 2008; he worked as general counsel for another company for six months beginning in July 2008; he worked for another company until September 2009; and he received unemployment benefits during the periods when he was out of work. FRC notes that there is no evidence of the amount of Faigin's income after March 2008.

The trial court instructed the jury that any damages for breach of contract could not include amounts for "harm that FRC proves Mr. Faigin could have avoided with reasonable efforts or expenditures."

In our view, the absence of evidence of Faigin's income after March 2008 does not compel the conclusion that he suffered no damages as a result of the termination of his employment with FRC. Instead, the jury could have reasonably concluded that his short-term employment and unemployment benefits after March 2008 did not match his previous salary.

### c. *FRC Has Not Shown That the Damages Are Excessive*

FRC also contends the damages are excessive. Citing evidence that employees without written employment contracts were offered one week's severance pay for each year of employment in exchange for a signed release, FRC argues that Faigin should have been awarded only $98,077, or at most $228,846, based on the same policy. FRC also argues that the jury erred by awarding an amount equal to three years of Faigin's 2008 annual salary of $449,000 rather than three times his 2007 annual salary of $425,000.

An appellate court can reverse an award of compensatory damages as excessive only if, viewing the evidence in the light most favorable to the judgment, the court concludes that the award is so grossly disproportionate to the harm suffered that it shocks the conscience and suggests that the jury was influenced by passion or prejudice. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 419 [185 Cal.Rptr. 654, 650 P.2d 1171]; *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506–507 [15 Cal.Rptr. 161, 364 P.2d 337].)

---

intended to prohibit a covered institution from making such a payment even after the institution is no longer troubled. The rule, however, does not restrict payments made by an institution that is no longer regulated by the FDIC.

The jury in deciding the terms of the implied-in-fact agreement evidently credited the evidence that FRC agreed to pay Royer, a senior executive like Faigin, three years' salary in the event of the termination of his employment without cause more than it credited the evidence that lower level employees were eligible to receive significantly less upon the termination of their employment without cause. This was the jury's prerogative as the trier of fact. In light of the evidence, we cannot conclude that the jury was influenced by passion or prejudice in this regard.

We also reject FRC's argument relating to the amount of Faigin's final salary. The precise amount to be awarded was a question for the trier of fact and, to some extent, the trial court in the exercise of its discretion on a new trial motion. In light of the evidence and the total award of $1,347,000, the difference between three times $425,000 and three times $449,000 ($72,000) is not so great as to shock the conscience or suggest that the jury was influenced by passion or prejudice in calculating damages based on the larger salary. This kind of fine-tuning of the jury's award is not the province of the Court of Appeal.

### 4. *FRC Has Shown No Error in the Admission of Evidence*

#### a. *The Admission of Evidence of Royer's Employment Contract with FRC Was Proper*

Faigin's counsel questioned Royer on cross-examination regarding his November 2007 written employment contract with FRC. Royer testified that his annual salary under the contract was $500,000, that the agreed term of his employment was three years and that the contract provided for a severance payment in the amount of three years' salary, and other benefits, in the event of the termination of his employment without cause. Royer testified that Faigin had received no severance pay from FRC.

FRC's counsel moved to strike all references to Royer's employment contract on grounds of relevance. The trial court reserved its ruling on the motion, and later denied the motion.

Faigin's counsel later questioned Royer on the definition of "cause" in his employment contract and moved to admit in evidence a single page of the contract containing a definition of the term "cause." FRC objected on grounds of relevance. The trial court overruled the objection and admitted the single page in evidence.

FRC contends the testimonial and documentary evidence of Royer's written employment contract with FRC was not relevant to the existence and

terms of any implied-in-fact employment contract with Faigin. We conclude that FRC has shown no prejudicial error.

■ Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has a tendency in reason to prove or disprove a material disputed fact. (*Id.*, § 210.) The trial court has broad discretion in ruling on the relevance of evidence. (*People v. Hamilton* (2009) 45 Cal.4th 863, 913 [89 Cal.Rptr.3d 286, 200 P.3d 898].) The court abuses its discretion only if its ruling is arbitrary, capricious or patently absurd. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].) We can reverse a judgment based on the erroneous admission of evidence only if it is reasonably probable that the appellant would have obtained a more favorable result absent the error, so the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); *People v. Richardson* (2008) 43 Cal.4th 959, 1001 [77 Cal.Rptr.3d 163, 183 P.3d 1146].)

■ The existence and content of an implied-in-fact agreement to terminate only for good cause are determined from the totality of the circumstances, including the employer's personnel policies and practices. (*Guz, supra,* 24 Cal.4th at pp. 336–337.) Evidence of a party's contract with a third party may be relevant to show customary contract terms. (*Brawthen v. H & R Block, Inc.* (1975) 52 Cal.App.3d 139, 148 [124 Cal.Rptr. 845]; *Firlotte v. Jessee* (1946) 76 Cal.App.2d 207, 210–211 [172 P.2d 710]; see Comment, *Admissibility of Similar Transactions to Prove the Principal Transaction* (1955) 2 UCLA L.Rev. 394, 395–401; but see *Lande v. Southern Cal. Freight Lines* (1948) 85 Cal.App.2d 416, 422–423 [193 P.2d 144].) ■ We conclude that the trial court reasonably concluded that Royer's employment contract with FRC was relevant to FRC's personnel practices and to the existence of customary terms in FRC's employment contracts with senior management, and therefore could have some tendency in reason to prove the existence of similar terms in Faigin's implied-in-fact employment contract. FRC has shown no abuse of discretion in this regard.

  b. *The Admission of Faigin's Testimony Regarding an Assurance of Job Security Was Proper*

Faigin's counsel questioned Faigin about a conversation that he had in 2007 with the outgoing chairman of FRC's board of directors, Louis J. Rampino, regarding Faigin's future role in the company. FRC's counsel objected on grounds of hearsay. The trial court overruled the objection. Faigin then testified that Rampino stated that if FRC hired a new management team, Faigin would continue to have a critical role in the company and that in light of his long history with FRC, Faigin could expect to be employed there for the rest of his career.

■ FRC contends this testimony was irrelevant, unduly prejudicial and speculative. FRC failed to assert those grounds for objection or exclusion in the trial court, however, and therefore waived any objection on those grounds. (Evid. Code, § 353, subd. (a).) FRC also contends this testimony was inadmissible hearsay. We disagree.

■ Evidence of an out-of-court statement offered to prove the truth of the matter stated is hearsay. (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless an exception to the hearsay rule applies. (*Id.*, subd. (b).) As we explain below, this testimony was not hearsay.

■ Oral assurances of job security relate to the existence of an implied-in-fact agreement to terminate only for good cause. (*Guz, supra,* 24 Cal.4th at p. 343; *General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1178 [32 Cal.Rptr.2d 1, 876 P.2d 487]; *Stillwell v. The Salvation Army* (2008) 167 Cal.App.4th 360, 381 [84 Cal.Rptr.3d 111].) Such assurances, considered in the totality of the circumstances, may support the existence of an implied promise to terminate only for good cause. (*Guz, supra,* at pp. 336–337; *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 463–464 [46 Cal.Rptr.2d 427, 904 P.2d 834].) Thus, an employer's assurances of job security are, in and of themselves, evidence of the existence of such an implied promise. The plaintiff need not prove that the employer intended to fulfill such a promise, but only that the implied promise was made. Accordingly, we conclude that evidence of an employer's assurance of job security is not hearsay in these circumstances. FRC has shown no abuse of discretion in the admission of Faigin's testimony.

    c.   *The Admission of Faigin's Testimony Regarding His Predecessor's Employment as FRC's General Counsel Was Proper*

Faigin's counsel asked Faigin whether FRC had ever terminated the employment of his predecessor as general counsel, Edward Lieber. FRC objected on grounds of relevance. Faigin answered, "No." The trial court stated, "Well, we'll leave the answer, but I think that general subject is irrelevant." Thus, despite agreeing that the general subject was irrelevant, the court apparently overruled the objection to the specific question and declined to strike the testimony. Faigin then stated, "He retired." Faigin later testified that Lieber had retired at the age of 72 after many years of service. FRC did not object at that time or move to strike that testimony.

FRC contends this testimony was irrelevant and unduly prejudicial. FRC failed to assert the latter grounds in the trial court and therefore waived any objection on those grounds. (Evid. Code, § 353, subd. (a).) Moreover, FRC

objected to only the initial question whether it had ever terminated Lieber's employment and therefore cannot complain of any error with respect to the admission of the subsequent testimony.

We believe that it was not clearly unreasonable for the trial court to conclude that the facts that FRC never terminated Lieber's employment and that he continued to serve as FRC's general counsel until his retirement were relevant to FRC's personnel practices and to the existence of an implied-in-fact agreement to terminate only for good cause. FRC has shown no abuse of discretion in this regard.

### 5. *FRC Has Shown No Instructional Error*

FRC contends the refusal of two of its proposed special instructions on required third party approval to form a contract was error. FRC's proposed special instruction No. 10 stated that even if the parties consent to a contract, the formation of a valid contract may require the approval of a third party. Its proposed special instruction No. 15 defined the term "affiliate" in accordance with the Federal Deposit Insurance Act. Both instructions related to the provision in the cease and desist order requiring FRC to obtain the prior written approval of the FDIC and the Department of Financial Institutions before employing any senior executive associated in any manner with an affiliate.

The trial court expressly refused FRC's proposed special instruction No. 15. The court stated that it had already determined that if the jury found an implied-in-fact employment contract, such a contract was valid. The court stated later in discussing the verdict form that there was insufficient evidence to submit to the jury any questions relating to, in the words of FRC's counsel, "the golden parachute regulations and the cease and desist." Although the court did not expressly refuse FRC's proposed special instruction No. 10, we construe these other statements by the court as a rejection of FRC's defense based on the failure to obtain prior written approval of Faigin's implied-in-fact employment contract and a refusal of the proposed special instruction.

A party is entitled to an instruction on each viable legal theory supported by substantial evidence if the party requests a proper instruction. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The refusal of a proper instruction is prejudicial error only if " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Id.* at p. 580.) "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled. [Fn. omitted.]" (*Id.* at pp. 580–581.)

We conclude that the prior written approval requirement in the cease and desist order applied only to new employees, as we have stated. The cease and desist order was issued in March 2007. Regardless of when an implied-in-fact employment contract came into existence, there is no substantial evidence that Faigin became an FRC employee after the date of the cease and desist order. Moreover, our review of the record indicates that any error in failing to give the instruction was not prejudicial.

### 6. *The Denial of Prejudgment Interest Was Proper*

Faigin contends the denial of his motion for prejudgment interest under Civil Code section 3287, subdivision (b) was error. He acknowledges that an award of prejudgment interest under this provision is discretionary with the trial court, but argues that all of the relevant factors support an award in this case. He particularly emphasizes the point that FRC was aware of the amount he sought as damages—three times his annual salary—throughout this litigation, and the jury awarded approximately that same amount.

The trial court stated in denying prejudgment interest that the amount of damages sought by Faigin had changed during the course of the litigation from a liquidated amount equal to three times his annual salary, based on his written employment contract with Fremont General, to an unliquidated amount as much as his total expected earnings until age 65. The court noted that the written employment contract was excluded from evidence and stated that an award of prejudgment interest in these circumstances would not prevent a windfall to FRC, but instead would result in a windfall to Faigin.

Civil Code section 3287, subdivision (b) authorizes the trial court, in its discretion, to award prejudgment interest on an unliquidated contract claim from a date no earlier than the date the action was filed.[7] (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 496–497 [186 Cal.Rptr. 114] [affirmed an award of prejudgment interest]; *Esgro Central, Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1064–1065 [98 Cal.Rptr. 153] [affirmed the denial of prejudgment interest].) This provision allows the trial court the flexibility to determine whether an award of prejudgment interest is appropriate in light of the particular facts and circumstances in the case. (*A & M Produce Co., supra*, 135 Cal.App.3d at p. 496.) "By allowing an award of prejudgment interest, but only for a limited time period and only if the trial court finds it reasonable in light of the factual circumstances of a particular case, Civil Code section 3287, subdivision (b), seeks to balance the concern

---

[7] Civil Code section 3287, subdivision (b) states: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

for fairness to the debtor against the concern for full compensation to the wronged party. [Citations.]" (*Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 69 [108 Cal.Rptr.2d 715].)

"An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.] This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise. [Citations.]" (*Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158 [67 Cal.Rptr.3d 228].)

*A & M Produce Co. v. FMC Corp., supra*, 135 Cal.App.3d at pages 496–497, cited several factors supporting an award of prejudgment interest in the exercise of the trial court's discretion. A determination that, in the particular circumstances of the case, a prejudgment interest award would be permissible in the exercise of the court's discretion, however, does not compel the conclusion that the denial of such an award in similar circumstances would be an abuse of discretion. (*Esgro Central, Inc. v. General Ins. Co., supra*, 20 Cal.App.3d at p. 1065.) Instead, we must affirm the denial if there was a reasonable basis for the court's decision in accordance with the governing rules of law. (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 815 [148 Cal.Rptr. 22, 582 P.2d 109].)

Faigin consistently sought damages of three times his annual salary until the trial court excluded his written employment contract with Fremont General on FRC's motion in limine. The amount of damages sought was uncertain from that date forward. Faigin acknowledges that the claim on which he prevailed at trial was unliquidated. He does not challenge either the exclusion of his written employment contract or the denial of relief on his count for breach of the written contract. Yet he seeks to invoke the certainty of the involuntary termination payment provision in the written employment contract in arguing that the amount of damages was known throughout the litigation.

FRC defended against Faigin's count for breach of the written employment contract until the middle of trial when the trial court rejected the claim and granted leave to amend the complaint to allege the claim on which Faigin prevailed at trial. We conclude that the court reasonably concluded that the claim on which Faigin prevailed at trial was unliquidated and uncertain, that in these circumstances the denial of prejudgment interest would not result in a windfall to FRC and that an award of prejudgment interest in these circumstances would result in a windfall to Faigin. Faigin has shown no abuse of discretion in the denial of prejudgment interest.

### *DISPOSITION*

The judgment and the order denying FRC's motion for judgment notwithstanding the verdict are affirmed. The order denying Faigin's motion for prejudgment interest is also affirmed. Each party must bear its costs on appeal.

Kitching, J., and Aldrich, J., concurred.

The petition of appellant Signature Group Holdings, Inc., for review by the Supreme Court was denied February 20, 2013, S207410.