Filed 9/3/13  Garcia v. Service Corp. International CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MATEO RUELAS GARCIA, | B237964 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC430926) |
| v. | |
| SERVICE CORPORATION INTERNATIONAL et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Elizabeth Allen White, Judge.  Affirmed.

Steinbrecher & Span, Robert S. Span for Plaintiff and Appellant.

Gurnee & Daniels, Steven H. Gurnee, Toby M. Magarian; Gilbert Kelly Crowley & Jennett, Arthur J. McKeon III, Vanessa Hubert for Defendants and Respondents.

_____

Cemetery worker Mateo Ruelas Garcia was terminated from his employment after damaging an existing gravesite with a backhoe, then covering up the damage instead of reporting it to his supervisor, as required by company policy. He made two claims against his employer for wrongful termination in violation of public policies protecting whistleblowers, which were rejected by a jury; however, the jury found an implied covenant not to terminate except for good cause, and a breach of the implied covenant of good faith and fair dealing.

The trial court granted judgment notwithstanding the verdict (JNOV) for the defendants. The ruling is correct. The company handbook describes employees as "at-will," and plaintiff testified at trial to his understanding that he could be terminated at any time and for any reason. There is no evidence that plaintiff received individual promises that he would be terminated only for good cause, and mere longevity of employment does not establish a right to remain on the job indefinitely. We affirm.

## FACTS

Plaintiff Mateo Ruelas Garcia worked 28 years at Eden Memorial Park (Eden), a mortuary/cemetery owned by defendant Service Corporation International (SCI) and its subsidiaries.[1] Plaintiff, who has three years of primary schooling, started out by caring for the lawn and cleaning tombstones, then graduated to setting up tents and greenery for graveside services and driving a tractor. By the mid-1990's, plaintiff had responsibility for digging graves with a backhoe.

Plaintiff and his coworkers prepared five to 10 graves per day. Plaintiff excavated "thousands" of graves. Two former Eden managers described plaintiff as a trusted employee who received regular merit pay raises. He became an assistant supervisor in 2006; in that position, he no longer operated a backhoe.

Plaintiff acknowledged receipt of his employer's handbook, and agreed to obey the company's "Code of Conduct." The company handbook states that employees are "at

---

[1]     Codefendants SCI California Funeral Services, Inc. (SCI California) and California Cemetery and Funeral Services, LLC (CCFS) fall under SCI's umbrella.

2

will" and may be terminated at any time, with or without notice, and with or without cause. Plaintiff testified that he knew his employment was "at will" and could end at any time, with or without cause. The Code of Conduct is posted in English and Spanish in the grounds crew offices.

Plaintiff's supervisors regularly conducted meetings to discuss company policies and employee responsibilities. Plaintiff attended these meetings. Employees were told that if something went wrong or broke while preparing a grave, or if a casket, urn or remains were found, they must stop work and report it to management.

Plaintiff's personnel file shows that he was disciplined multiple times for violating company policy. In 2000, he was disciplined for a "wrongful burial," i.e., digging a grave and causing an interment at a site that the deceased's family did not own. Plaintiff was warned in writing that any future wrongful burials could result in a suspension or termination. It is a serious offense. In 2004, plaintiff received a written warning for failing to cover graves properly. In April 2007, plaintiff was warned about setting grave markers incorrectly.

In June 2007, plaintiff again caused a "wrongful burial" and was warned in writing that "[a]ny further problems of this nature . . . not in alignment with company values or goals will result in further disciplinary actions including up to termination." Plaintiff blamed another employee for leading the mourners and the coffin to the wrong gravesite. Plaintiff was required to take a remedial interment course as a result of the wrongful burial. On October 10, 2007, plaintiff was demoted from his position as assistant superintendent. Plaintiff was upset and embarrassed to be demoted in front of fellow employees.

During his years of preparing graves at Eden, plaintiff testified that he saw a coworker damage gravesites "many times," either deliberately or accidentally, occasionally causing pieces of coffins and even bones to fall out of gravesites. Workers would try to fix the damage, but sometimes human remains were scooped up by a tractor and taken to a cemetery dump. Plaintiff claimed that the general manager was aware of these incidents, and plaintiff's supervisor directed plaintiff to break nearby gravesites to

3

allow room for a new burial. Plaintiff testified that he was just following orders when he participated in gravesite desecrations.

On cross-examination, plaintiff acknowledged that Eden's general manager always told him to be careful and respectful, and not to harm the deceased. Plaintiff knows that this is company policy. If something went wrong, he was taught to report it to Eden's management. He is familiar with the "important" company policy of treating the body of the deceased "reverently," and realizes that management wanted to know if a burial container was broken so that families could be contacted and appropriate repairs made. He also knew that he could be fired for violating company policies.

SCI California conducts "interment verification" training sessions for its employees. During a session on October 18, 2007, when plaintiff was not present, the managing director of SCI California learned from some Eden employees that they were instructed by Eden supervisors to break concrete vaults or caskets of adjoining graves to make room for new interments.[2] Eden managers threatened to axe employees who did not make new graves fit, even if doing so damaged surrounding gravesites. When employees obeyed this mandate, on occasion the vault surrounding the casket, the casket, and human remains were discarded. The interment crew camouflaged damaged gravesites with artificial grass during funeral services.

A training session for a different set of interment crew members was held on October 19, 2007, which plaintiff attended. The complained-of conduct discussed one day earlier was not raised in an open session. In private meetings with the managing director of SCI California, some Eden employees raised the same concerns about gravesite disturbances and intimidation by Eden's management.

In response to employee disclosures, SCI sent a lawyer to Los Angeles to interview Eden's groundsmen and management. One of the groundsmen recalled that in 2002, he, plaintiff and another worker found a skull when they were excavating a new

---

[2] The purpose of the vault is to "keep the integrity of the ground above in the cemetery throughout" as graves settle into the earth over time.

4

grave above an existing site; they took the skull, put it in the dirt trailer and took it to a "spoils" site where excess dirt from new gravesites was dumped. Plaintiff was operating the backhoe. When interviewed a second time and asked about his coworker's claim about the skull, plaintiff confirmed the incident, though he did not reveal it in an earlier solo interview. None of the employees reported the incident to Eden management. Plaintiff's former supervisor was stunned at the revelation: when he asked plaintiff why he did not report the skull, plaintiff looked at the ground and did not respond.[3] The employees' actions and their failure to report the incident violated company policy. Eden's managers and grounds superintendent denied instructing employees to damage graves or disturb remains.

On December 12, 2007, SCI California terminated the employment of Eden's general manager as a result of the misconduct disclosed during the October 2007 training sessions and the follow-up investigation. On December 20, 2007, the recently fired general manager notified the state Department of Consumer Affairs (DCA) that Eden misused endowment funds and engaged in other wrongdoing. A DCA investigation concluded that five graves were disturbed and unprofessional conduct occurred. The DCA investigator was told by plaintiff's coworker on the interment crew that plaintiff was the gravedigger who broke the most vaults.

SCI has a nonretaliation policy for employees who disclose wrongdoing. Interment crew members were informed that they would not be disciplined for revealing information about burial problems. They were directed by SCI California not to obey any future instructions to break adjacent gravesites while preparing a new grave, because it violates written company policy to treat the deceased "with dignity and respect."

All groundsmen were told that henceforth, they must not damage prior interments to make way for new ones. Disturbing or mishandling human remains or breaking burial containers is considered a violation of company policy forbidding "indecent, immoral,

---

[3] During his deposition, the supervisor recalled that plaintiff said, "I couldn't go to management."

5

unprofessional or abusive conduct." If a gravesite will not fit in a space, employees cannot use part of another space or damage or remove any part of a container to make room: when confronted with this problem, employees must stop work and notify the general manager. Further, problems must never be concealed. The repercussion for violating this company policy is termination. SCI provides employees with a special toll-free telephone number to report any improprieties at its cemeteries.

On December 14, 2007, plaintiff received and signed a disciplinary memorandum stating that "During the course of our recent investigation, you admitted concealing a serious burial problem from management," referring to gravesite disturbances. When plaintiff received the December disciplinary memorandum, the general manager told plaintiff it was absolutely necessary to report broken burial containers. By his own admission, plaintiff then knew he could be fired for failing to report a broken container.

On January 27, 2008, plaintiff broke an existing grave container while digging a new grave. Plaintiff expressly acknowledged at trial that he broke the container with a backhoe. Plaintiff did not report it because he wanted to go to lunch. Two of plaintiff's colleagues immediately reported the damage to management.

Plaintiff concealed the damaged container with sand and dirt. Upon learning of the problem, a supervisor instructed plaintiff to remove the new vault: he observed the damage plaintiff had caused to the adjoining gravesite, as well as plaintiff's attempt to hide the damage. The concrete container was broken, not scratched, and had to be replaced after the deceased's family was notified. When asked why he failed to report the damaged grave to management, plaintiff replied, "I took care of it."

Plaintiff testified that the damage to the container seemed insignificant to him, compared to the "much worse" damage he had seen in the past. When plaintiff's coworkers told plaintiff that they should stop and report the damage, plaintiff declined because he "felt since it wasn't that much, let it be, let's continue with the work." Plaintiff admits to concealing the damage.

Based on this incident of concealing damage to a gravesite, SCI California terminated plaintiff from his employment on February 8, 2008. Defendants were unable

6

to produce the termination memo, but a supervisor explained that plaintiff was fired "for not reporting immediately a broken vault after we had a meeting to explain how we are going to do this, and actually gave him a written disciplinary memo after that meeting to make it crystal clear that we report these things." The supervisor denied that plaintiff was fired in retaliation for filing a complaint or participating in an investigation.

When he picked up his final paycheck, plaintiff told Eden's superintendent, Pedro Gonzalez, that "he had messed it up, and he apologized for what he had done." Gonzalez testified that he, personally, always reported damaged containers to the general manager.

In May 2008, several months after his termination, plaintiff was contacted by the DCA. He confirmed that grave disturbances occurred at Eden. He declined to meet a state investigator at the cemetery to show where disturbances occurred, saying "he didn't remember exactly where they were and there was really no need to meet with him out there." Plaintiff specifically recalled that a skull was removed from a grave and that one of the former managers instructed him to break existing vaults two or three times during plaintiff's years at Eden. Plaintiff told the state investigator that he was terminated "for an incorrect burial and a marker being placed in the wrong location." After being interviewed by the DCA, plaintiff went on television and claimed that the breaking of burial plots was a common practice during the last 10 years that he worked at Eden. He never made such a claim when he spoke to the DCA investigator.

Eden's current general manager testified that in the fall of 2009, there were five instances in which outer burial containers were damaged during the excavation of new graves. In those instances, the interment crew stopped work and notified the general manager who, in turn, tried to locate and contact the families of the deceased. The damage was then repaired. No interment crew members covered up damage instead of stopping and alerting management. Eden does not charge families to repair or replace damaged containers.

## PROCEDURAL HISTORY

In January 2010, plaintiff filed suit for wrongful termination; retaliatory termination in violation of state statute; breach of the implied covenant of good faith and

7

fair dealing; and defamation. In a special verdict, a jury found against plaintiff on his claims of wrongful discharge in violation of public policy and his defamation claim. It also found that there is an implied-in-fact contract not to terminate except for good cause, and that defendants breached the implied covenant of good faith and fair dealing. The jury awarded plaintiff $137,689 against CCFS and $19,015 against SCI.

Defendants objected that the trial court failed to instruct the jury that it could not find the existence of an implied contract to terminate for cause if there is an express at-will agreement, though defendants had requested such an instruction. Also, the court improperly modified the standard instruction for finding an implied contract not to terminate. There was no basis for the jury finding SCI liable for a breach of the implied covenant of good faith and fair dealing. The court overruled defendants' objections and entered judgment for plaintiff against CCFS and SCI.

SCI California moved to vacate the judgment and enter a new judgment in its favor, on the grounds that the judgment is not consistent with the special verdict. SCI and CCFS moved for JNOV or a new trial. On October 20, 2011, the trial court granted JNOV, found the motion for new trial to be moot, and entered judgment in favor of defendants. Plaintiff appealed on December 14, 2011.

## DISCUSSION

### 1. Standard of Review

When reviewing a JNOV, an appellate court determines "whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict. ""'If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied.'"" [Citations omitted.] In general, "'[t]he purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation.'"" (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

If the issues on a JNOV present solely a question of law—the interpretation and application of a statute to undisputed facts—review is de novo. (*Trujillo v. North County*

8

*Transit Dist.*, *supra*, 63 Cal.App.3d at p. 284.*)*  Further, the correctness and consistency of a special verdict must be analyzed as a matter of law and reviewed de novo.  (*Id.* at p. 285; *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.)  "A court reviewing a special verdict does not infer findings in favor of the prevailing party [citation], and there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict."  (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092; *Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 542.)

**2.  Existence of Implied Contract to Terminate for Good Cause**

   a.  *Jury Instructions and Jury Findings*

In a special verdict, the jury found that plaintiff (1) was not wrongfully discharged in violation of public policy against retaliatory terminations and (2) was not wrongfully discharged in violation of Labor Code section 1102.5 (prohibiting retaliatory firing).  The jury also found that "there was an implied in fact contract not to terminate except for good cause."

The jury instructions relating to its finding in favor of plaintiff state that "An employment relationship is not at will if the employee proves that the parties by word or conduct agreed that the employee would be discharged only for good cause.  Plaintiff Mateo Garcia claims that Defendant CCFS breached their employment contract.  To establish this claim, Plaintiff Mateo Garcia must prove all of the following:  One, that plaintiff and Defendant CCFS entered into an employment relationship; Two, that Defendant CCFS promised, by words or conduct, to discharge plaintiff only for good cause; Three, that plaintiff substantially performed his job duties; Four, that Defendant CCFS discharged plaintiff without good cause, and; Five, that Plaintiff Mateo Garcia was harmed by the discharge."

The instructions list bases for finding a promise by CCFS to discharge an employee only for good cause, such as CCFS personnel policies or practices, but noting that "length of service, raises, and promotions by themselves are not enough" to imply a

9

promise to discharge only for good cause.[4]  "Good cause exists [when] an employer's decision to discharge an employee is made in good faith and based on a fair and honest reason.  Good cause does not exist if the employer's reasons for the discharge are trivial, arbitrary, inconsistent with usual practices, unrelated to business needs or goals, or if the stated reasons conceal the employer's true reasons.  In deciding whether defendant had good cause to discharge Plaintiff Mateo Garcia, you must balance CCFS's interest in operating the business efficiently and profitably against the interest of Plaintiff Mateo Garcia in maintaining employment."

       b.  *Plaintiff's Testimony Prevented a Finding of an Implied Promise to Terminate for Good Cause*

       An employment having no specified term may be terminated at the will of either party.  (Lab. Code, § 2922; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 678.)  When employment is at will, the employer's "motive and lack of care"—including its "bad faith"—are generally irrelevant.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 351 (*Guz*).)  An at-will employer may even "act peremptorily, arbitrarily, or inconsistently, without providing specific protections such as prior warning, fair procedures, objective evaluation, or preferential reassignment."  (*Id.* at p. 350.)

       Plaintiff has the burden of rebutting the statutory presumption that his employment is at will.  (*Haycock v. Hughes Aircraft Co.* (1994) 22 Cal.App.4th 1473, 1489.)  The existence of an implied promise to discharge for cause is generally a question of fact for the jury; however, if the facts are undisputed and permit only one conclusion, the issue may be resolved as a matter of law.  (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1386-1387.)

       An at-will provision in an express written agreement or acknowledgement, signed by the employee, cannot be overcome by proof of an implied contrary understanding.

---

[4]     The instruction the court gave (as modified and proposed by plaintiff, over the objections of defendants), omits one critical element:  "Whether [defendant] said or did anything to assure [plaintiff] of continued employment."  (CACI No. 2403.)

10

(*Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 739; *Guz*, *supra*, 24 Cal.4th at p. 340, fn. 10.)  "Cases in California and elsewhere have held that at-will provisions in personnel handbooks, manuals, or memoranda do not bar, or necessarily overcome, other evidence of the employer's contrary intent."  (*Guz*, at p. 339.)  The Supreme Court agrees that "disclaimer language in an employee handbook or policy does not necessarily mean an employee is employed at will."  (*Id.* at p. 340.)  It added, "Of course, the more clear, prominent, complete, consistent, and all-encompassing the disclaimer language set forth in handbooks, policy manuals, and memoranda disseminated to employees, the greater the likelihood that workers could not form any reasonable contrary understanding" that they are not at-will.  (*Id.* at p. 340, fn. 11.)

The Supreme Court in *Guz* cited with approval cases holding that "long duration of service, regular promotions, favorable performance reviews, praise from supervisors, and salary increases do not, without more, imply an employer's contractual intent to relinquish its at-will rights."  (*Guz, supra,* 24 Cal.4th at p. 341.)  The court wrote, "We agree that an employee's *mere* passage of time in the employer's service, even where marked with tangible indicia that the employer approves the employee's work, cannot *alone* form an implied-in-fact contract that the employee is no longer at will."  (*Id.* at pp. 341-342.)  Rather, "the issue is whether the employer's words or conduct, on which an employee reasonably relied, gave rise to that *specific* understanding" that seniority and longevity of employment created rights against termination at will.  (*Id.* at p. 342.)

In this instance, plaintiff signed acknowledgements (in English and in his native language Spanish) in 2004 and 2005, upon receiving his employee handbook.  Printed material above plaintiff's signature addresses his employment status.[5]  Plaintiff does not

---

[5]      "I, Mateo Ruelas, hereby acknowledge that I have received a copy of the Company's Employee Handbook, which provides guidelines on the policies, procedures, and programs affecting my employment.  I understand that I am employed At-Will . . . .  I acknowledge that this handbook is neither a contract of employment nor a legal document and that nothing in this handbook nor any past practice or procedure, written or oral, creates an expressed or implied contract of employment.  No promises or

11

claim that he received individual promises or representations that his employer would retain him except for good cause. (See *Guz, supra,* 24 Cal.4th at p. 341.) On the contrary, plaintiff expressly testified at trial that he understood that the company has the right to sever employment at any time, with or without cause. He was asked "So you understood you could be fired at any time for any reason and that you could leave your job at any time for any reason, correct?" His response was, "Yes, I knew it."

Plaintiff testified that company policy requires careful and respectful treatment of the deceased and their gravesites. He realized that management wanted to be informed if a burial container was broken so that families could be contacted and appropriate repairs made. He testified that he knew he could be fired for violating company policies. Plaintiff expressly acknowledged at trial that he broke a grave container with a backhoe and did not report it to management. His rationale for concealing the damage instead of reporting it was that the damage seemed insignificant to him because he had seen "much worse" in the past. He told a DCA investigator in May 2008 that he was terminated for a wrongful burial and incorrect placement of a grave marker, not in retaliation for reporting illegal conduct at Eden, which is what the DCA was investigating.

Plaintiff observes that the company handbook assures that he would not be retaliated against for participating in an investigation or reporting violations of law or public policy. By special verdict, the jury found that plaintiff was *not* fired in violation of public policy, and was *not* fired in violation of Labor Code section 1102.5, i.e., in retaliation for reporting misconduct at Eden and being a whistleblower. The jury instructions for the rejected wrongful termination claims fully encompassed plaintiff's contention that he was fired because he disclosed or threatened to disclose information that he believes violated state or federal laws or regulations.

Despite the jury's rejection of his public policy and statutory wrongful discharge tort claims, plaintiff argues that JNOV was improperly granted because defendants

assurances, whether written or oral, which are contrary to or inconsistent with the limitations set forth in this paragraph create any contract of employment."

breached an implied contract not to terminate him in retaliation for reporting wrongful conduct. Employees have a statutory right to disclose information about employer wrongdoing to government agencies under Labor Code 1102.5, without threat of retaliation. There is no need to look for an implied contract not to retaliate against whistleblowers when there is already an express law covering the subject and protecting employees' rights in this area, as a matter of public policy.

Plaintiff failed to convince the jury of the validity of his two retaliatory firing claims. The jury clearly concluded that plaintiff was not fired for disclosing wrongful practices at Eden that were orchestrated by his supervisors. The only issue presented by the JNOV was whether plaintiff's employer made promises or representations that plaintiff would only be fired for good cause. As previously discussed, plaintiff expressly testified that he understood his employer could terminate him at any time, with or without cause, negating the possibility of finding an implied agreement to the contrary.

Even if, as plaintiff contends, a promise not to retaliate against "whistleblowers" created an expectation of continued employment after poor management practices were revealed, the evidence at trial does not support a finding that plaintiff was a whistleblower. The company handbook states that "Associates are not subject to retaliation for participating in protected activity, such as filing bona fide complaints, participating in any investigation, or reporting any violations of law or Company policy."

The nonretaliation policy cannot be interpreted to protect employees who merely confirm something that the employer already knows—that the employee himself violated company rules—as opposed to independently reporting the wrongdoing of others. In other words, the policy protects plaintiff's two colleagues who reported that plaintiff broke an adjacent coffin container while excavating a new grave in January 2008, but it does not protect plaintiff when his supervisor investigated the report, the broken container was revealed, and plaintiff admitted that he concealed the damage. Though plaintiff recalled "much worse" damage in the past, he also admitted that starting in December 2007, he knew for a fact that it was absolutely necessary to report broken containers and that he could be fired for failing to do so.

13

Any whistleblowing in this instance occurred during interment verification training on October 18, 2007, when some of plaintiff's coworkers disclosed in open session that they were instructed by Eden supervisors to damage adjoining graves to make room for new interments. Plaintiff was not present when the disclosures were made. The following day, plaintiff attended training, but no discussion about grave damage took place during an open session. Later on, in private meetings and in response to questioning, plaintiff may (or may not) have disclosed mishandling of human remains. In his deposition, plaintiff could not recall "what I said."

Someone who discloses personnel matters during an exclusively internal administrative investigation is not generally considered a whistleblower. A whistleblower is someone who discloses legal violations to a government agency, because the courts do not want to be thrust into "micromanaging employment practices . . . arising from the routine workings and communications of the job site." (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1385.) Giving plaintiff's testimony the broadest possible reading, there is no evidence that he was a whistleblower: plaintiff's colleagues blew the whistle on management, and he (at a later date) merely confirmed what his colleagues had already disclosed. Plaintiff did not initiate any disclosures; instead, the company solicited his input. Plaintiff's colleagues who originally disclosed wrongdoing at Eden were not fired, although the general manager certainly was, based on defendants' investigation.

No substantial evidence supports a finding of an implied-in-fact contract to terminate for good cause. Plaintiff forthrightly admitted at trial that (1) the company handbook states that his employment is at-will; (2) he understood he could be terminated at any time, without cause; (3) he was required to report broken grave containers; (4) he broke a grave container with a backhoe, ignored his coworkers' pleas to report the damage, and concealed the damage; and (5) he knew he could be terminated for violating company policies.

Plaintiff did not testify to any understanding that he could only be terminated for cause. The evidence showed, and the jury found, that plaintiff was not terminated in

14

retaliation for being a "whistleblower." Temporal proximity between an employee's protected actions and his termination, standing alone, is not sufficient evidence of a pretextual firing when there is proof that the employer had a legitimate reason for termination. (*Arteaga v. Brink's Inc.* (2008) 163 Cal.App.4th 327, 357.)

**3. <u>Covenant of Good Faith and Fair Dealing</u>**

The jury awarded plaintiff damages for breach of the implied covenant of good faith and fair dealing. "[T]he implied covenant of good faith and fair dealing imposes no independent limits on an employer's prerogative to dismiss employees." (*Guz*, *supra*, 24 Cal.4th at p. 351.) "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes." (*Foley v. Interactive Data Corp., supra,* 47 Cal.3d at p. 690.) When employment is at will and there is no evidence of a promise of continued employment, a claim for breach of the implied covenant of good faith and fair dealing fails. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 480-481.)

As discussed in section 2, *ante*, plaintiff's employment was at will and there was no promise of continued employment. As a result, his claim for breach of the implied covenant of good faith and fair dealing fails. As a further basis for vacating the judgment, the jury awarded damages against SCI, although the jury instructions only refer to CCFS. If the jury was instructed to make findings only as to CCFS, it could not award damages against a defendant who was not mentioned in the instructions. (Compare *Weddle v. Loges* (1942) 52 Cal.App.2d 115, 119, in which the jury allocated damages among "two joint tort feasors.")

15

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                    BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.